## ARGUED AND DETERMINED

IN THE

# SUPREME JUDICIAL COURT

OF

# MASSACHUSETTS.

---

ELIJAH C. LAWRENCE *vs.* PULLMAN'S PALACE CAR COMPANY.

Suffolk. Jan. 11. — Feb. 24, 1887. HOLMES & GARDNER, JJ., absent.

A railroad corporation and a palace car company executed a written contract, by which the car company was to furnish cars to be used by the corporation for the transportation of passengers, keep such cars in proper order, and provide employees to collect the fare for the accommodations furnished by its cars and to attend upon the passengers, and its employees were to be governed by such rules and regulations as the railroad corporation might from time to time adopt for the government of its own employees. The railroad company was to provide fuel for the cars. The train conductors of the railroad had full authority over the porters and conductors of the palace cars in regard to determining who should ride in the cars, and under what circumstances. A regulation of the railroad corporation provided that between B. and N. a ticket for a sleeping berth in the palace cars would be sold only to one holding a ticket over the whole route. A., who had a ticket good from B. to P., an intermediate station, and another ticket good from P. to N., applied for a sleeping berth ticket from B. to N., but the ticket agent refused to sell it to him, because he did not have a single through ticket to N. A. then entered the palace car at B., and the conductor of that car refused to sell him a sleeping berth for the same reason given by the ticket agent; and the train conductor also refused to furnish A. with a sleeping berth unless he would pay full fare from B. to N., which he declined to do. The train conductor, after A. had repeatedly refused to leave the car upon his request, placed his hand upon him, when A. arose, and the palace car conductor took hold of A.'s arm. A. then turned, and walked to the door of the car, the train conductor opened it, and the palace car conductor again took hold of A.'s arm and led him across the platform, the train being in motion,

and into another car, the door of which was opened by the train conductor. This car was provided with reclining chairs, one of which A. occupied; and, during the night, the car became cold, in consequence of which A. caught a severe cold. *Held*, that A. could not maintain an action against the palace car company.

TORT, for being expelled from one of the defendant's cars. Trial in the Superior Court, before *Gardner*, J., who reported the case for the determination of this court, in substance as follows:

The plaintiff introduced in evidence a contract between the Pennsylvania Railroad Company of the first part, and the defendant corporation of the second part, the material portions of which are as follows:

"First. The party of the second part, in consideration of the covenants and agreements hereinafter mentioned on the part of the first party, to be by them kept and performed, hereby agrees with the party of the first part that they will furnish drawing-room cars and sleeping cars to be used by said first party for the transportation of passengers, sufficient in the judgment of the president of said first party to meet the requirements of travel on and over their line of railroad, and on and over all lines of railroad which they now control or may hereafter control by ownership, lease, or otherwise.

"Second. The said party of the second part hereby agrees that they will keep the carpets, upholstery, and bedding of each of the said cars in good order and repair, and renew and improve the same when necessary, at their own expense, excepting repairs and renewals made necessary by accident or casualty happening to said cars while running upon the road of said first parties. It being understood that the said first parties shall be paid all damages to said cars of every kind occasioned by accident or casualty.

"Third. The said party of the second part hereby agrees, at their own cost and expense, to furnish one or more employees, as may be needful upon each of said cars, whose business it shall be to collect fare for the accommodations furnished in said cars, and generally to wait upon passengers therein, and provide for their comfort."

"Fifth. It is hereby mutually agreed that the said employees of the second party, named in article third of this agreement,

shall be governed by, and subject to, the rules and regulations of said first party, which are or may be adopted from time to time for the government of its own employees. . . . .

"Sixth. The said party of the first part, in consideration of the use of the aforesaid cars, hereby agrees to haul the same on the passenger trains on their own line of road, and on all roads which they now control, or may hereafter control, by ownership, lease, or otherwise, and also on all passenger trains on which they may, by virtue of contracts or running arrangements with other roads, have the right to use such cars and facilities, in such manner as will best accommodate passengers desiring the use of said cars. And the said party of the first part shall, at their own expense, furnish fuel for the cars, and materials for the lights, and shall wash and cleanse said cars, and shall also keep said cars in good running order and repair, including renewals of worn-out parts, and all things appertaining to said cars necessary to keep them in first-class condition, except such as are provided for in article second of this agreement."

"Eighth. The said party of the first part further agrees that the said party of the second part shall be entitled to collect from each and every person occupying said cars such sum for said occupancy as may be usual on competing lines furnishing equal accommodations, and that such rules and regulations shall be mutually agreed upon as will most favor the renting of seats and couches in said cars."

The plaintiff also offered in evidence the answers of George M. Pullman to interrogatories propounded to him by the plaintiff, in which he testified that the ordinary train conductors of the Pennsylvania Railroad Company have full and entire authority over the porters and conductors of the Pullman cars, in regard to the matter of determining who shall ride in the cars, and under what circumstances, and in regard to every other thing, except the detail of keeping the Pullman cars and their furniture in good condition and suitable for the comfortable accommodation of passengers.

The Pennsylvania Railroad Company was operating, in 1882, a line of railroad from New York to Baltimore, passing through Philadelphia. The plaintiff testified that, in March, 1882, he

purchased of the Pennsylvania Railroad Company, at its office
in New York, a first-class ticket, called a return ticket, good for
five days, for transportation between New York and Philadel-
phia and return, sold at a reduction in consideration of the sale
for the round trip and the limitation in time. He proceeded
to Philadelphia, and thence to Baltimore. On March 18, at
eleven o'clock in the evening, he purchased, at the ticket office
of the passenger station of the Pennsylvania Railroad Company,
in Baltimore, a ticket from Baltimore to Philadelphia. He had
then in his possession the return portion of his round-trip ticket
purchased in New York, and good from Philadelphia to New
York, and it was his intention to proceed directly to New York
on a train then nearly due at Baltimore from the south. The
same agent who sold the plaintiff the ticket from Baltimore to
Philadelphia also had charge of the sale of tickets for the Pull-
man sleeping cars, and, when the plaintiff purchased his ticket
to Philadelphia, he at the same time applied to this agent for a
sleeping-berth ticket to New York. The agent refused to sell
him the latter, and told him that, in order to get a berth to New
York, he would have to buy a ticket to New York; that he
could not sell him a sleeping berth to New York on a ticket to
Philadelphia. The plaintiff testified that he tried to explain to
the ticket seller that he already had a ticket from Philadelphia
to New York, but that the agent, being engaged in a dispute
with another person, did not attend to him.

When the train for New York arrived at the Baltimore sta-
tion, the plaintiff entered the sleeping car for New York, which
was a car owned by the defendant and managed by the Pennsyl-
vania Railroad Company under the contract above set forth, and
asked the Pullman conductor for a berth to New York. There
were berths in it then unoccupied. The Pullman conductor
asked the plaintiff to show him his railroad ticket. The plain-
tiff thereupon produced his ticket from Baltimore to Philadel-
phia, and the return half of his round-trip ticket between New
York and Philadelphia. The Pullman conductor thereupon in-
formed the plaintiff that he could not sell him a berth in the
New York sleeping car on those split tickets; that he had re-
ceived orders not to sell any sleeping-car berths except to those
holding through passage tickets, intact, to the point to which

sleeping accommodations were desired. He offered to sell the plaintiff a berth in the Philadelphia sleeping car, and, when this car reached Philadelphia, there to provide him with other accommodations for sleeping, but this the plaintiff declined. Nothing further took place except discussion until the Pennsylvania Railroad Company's train conductor came into the car. The train conductor took up the plaintiff's railroad ticket from Baltimore to Philadelphia, and, as the plaintiff thinks, punched it, and put it in his pocket. The train conductor was then told by the Pullman conductor that the plaintiff desired sleeping accommodations to New York. The train conductor informed the plaintiff that he could not have sleeping-car accommodations to New York in that car, upon the tickets which he had produced. The plaintiff then offered to pay cash fare between Philadelphia and New York. The train conductor replied to the plaintiff, that, in order to have sleeping-car accommodations in the New York sleeping car, he must either have a through railroad ticket to New York, intact, or pay the regular cash railroad fare from Baltimore, where he took the train, to New York, and refused sleeping-car accommodations in the New York car upon any other terms. The plaintiff did not offer such a ticket, and declined to pay the cash fare. The conductor did not offer to return the ticket from Baltimore to Philadelphia; and it did not appear that the plaintiff demanded its return, or called the conductor's attention to it. The train conductor went out of the sleeping car and returned several times, and had some conversation with the Pullman conductor, which the plaintiff did not hear.

The train conductor several times requested the plaintiff voluntarily to leave the car, and the plaintiff refused to do so. The plaintiff testified that he had made up his mind not to leave the car until he was forced to do so, or some show of force was exhibited. The Pennsylvania Railroad Company's conductor then laid his hand upon the plaintiff's shoulder, saying, " I think I see what you want." The plaintiff rose to his feet. The Pullman conductor then took hold of the plaintiff's arm. The plaintiff turned around and then walked to the door of the car, the train conductor in front of him, and the Pullman conductor behind him. The train conductor opened the car door,

still keeping in front of the plaintiff. Upon the platform the plaintiff hesitated, and the Pullman conductor again took hold of the plaintiff's arm and led him across the platform into the next car, holding his arm all the way from one car into the other car. The train was at this time in motion. Before leaving the Pullman sleeping car, the plaintiff tendered to the Pullman conductor the price of a berth. The plaintiff also testified, upon cross-examination, that, when the Pullman conductor took hold of his arm as he rose, he did the plaintiff no injury; and that he did the plaintiff's arm no injury when he led him from one car to the other.

There was no evidence that the Pullman conductor used any force toward the plaintiff, or touched him, except by taking hold of the plaintiff and leading him in the manner above described.

The plaintiff testified as follows: " At the time I was led from the sleeping car into the next car, it was a dark night, about midnight, and the train was an express, and was a fast-running train, and the wind was blowing. The Pullman conductor led me across the platform; the train conductor went ahead and opened the doors for us. The car into which I was led became very cold before morning, so much so that I took off my overcoat and put it over my legs, which trouble me in cold or storm, having been wounded in my legs at Shiloh. In consequence of this cold, I took a severe cold, was unable to attend to business for a time, and I suffered severe pain. The car into which I was taken was provided with reclining chairs; I think it went through to New York, and I paid my fare for the reclining chair to said Pullman conductor. The Pullman conductor said he would give me one of these chairs. I said, ' If this is the best I can have, I will take it.' I could not sleep in that car. I think it was as well provided, so far as everything but temperature, as such reclining-chair cars usually are. It was a very good car, better than the ordinary accommodation furnished in the simple ordinary passenger cars of the road. I made no complaint to the porter that the fire was not kept up. I think I asked for a blanket, and got one. I know of no request which I made for accommodation in the way of comfort, such as was adapted, of course, to the kind of car I was in, that was not

complied with. I did not request any special fire to be made up, stating that I was cold and required it. I asked for nothing but a blanket."

The rule of the Pennsylvania Railroad Company relating to the sale of berths in the Pullman sleeping cars, signed by the general passenger agent, was put in evidence by the defendant, and was as follows: " On and after receipt of this notice you will refuse to sell Pullman seat checks or berths to persons not supplied with a through passage ticket, intact, and you must decline to sell to a point beyond, on presentation of tickets reading ' between intermediate stations.' "

This was all the evidence offered by the plaintiff. The defendant asked the judge to rule that, upon the evidence, the plaintiff could not maintain his action. The judge so ruled; and ordered a verdict for the defendant. If the ruling was correct, judgment was to be entered on the verdict; otherwise, a new trial to be had.

*S. B. Allen & T. B. King*, for the plaintiff.

*B. N. Johnson*, for the defendant.

DEVENS, J. The gist of the plaintiff's claim is that he was wrongfully refused accommodation in the sleeping car of the defendant, in coming from Baltimore to New York, by the defendant's servants; and that, on declining to leave the car, he was ejected therefrom. His argument assumes that it was for the defendant to determine under what circumstances a passenger should be allowed to purchase a berth, and, incidentally, the other accommodations afforded by the sleeping car. An examination of the contract with the Pennsylvania Railroad Company, by virtue of which the cars owned by the defendant were conveyed over its railroad, shows that, while these cars were to be furnished by the defendant corporation, they were so furnished to be used by the railroad company "for the transportation of passengers;" that its employees were to be governed by the rules and regulations of the railroad company, such as it might adopt, from time to time, for the government of its own employees. While, therefore, the defendant company was to collect the fares for the accommodations furnished by its cars, keep them in proper order, and attend upon the passengers, it was for the railroad company to determine who

should be entitled to enjoy the accommodations of these cars, and by what regulation this use of the cars should be governed. The defendant company could not certainly furnish a berth in its cars until the person requesting it had become entitled to transportation by the railroad company as a passenger, and he must also be entitled to the transportation for such routes, distances, or under such circumstances, as the railroad company should determine to be those under which the defendant company would be authorized to furnish him with its accommodations. The defendant company could only contract with a passenger when he was of such a class that the railroad company permitted the contract to be made.

The railroad company had classified its trains, fixing the terms upon which persons should become entitled to transportation in the sleeping cars, and the cars in which such transportation would be afforded. It was its regulation that, between Baltimore and New York, this accommodation should only be furnished to those holding a ticket over the whole route. It does not appear that this was an unreasonable rule, but, whether it was so or not, it was the regulation of the railroad company, and not of the defendant. The evidence was, " that the ordinary train conductors of the Pennsylvania Railroad Company have full and entire authority over the porters and conductors of the Pullman cars, in regard to the matter of determining who shall ride in the cars, and under what circumstances, and in regard to every other thing, except " the details of care, &c. The defendant's servant, the plaintiff having entered the sleeping car, informed him that his " split tickets," as they are termed, were not such as would entitle him to purchase a berth, and that he could sell only to those holding " through passage tickets, intact, to the point to which sleeping accommodations were desired." The plaintiff was in no way disturbed until the train conductor (who was not the defendant's servant) came into the car, informed the plaintiff that his tickets were not such as to entitle him to purchase the sleeping-car ticket, and several times urged the plaintiff to leave the sleeping car, which the plaintiff refused to do. Whether accommodation was rightly refused to the plaintiff or not in the sleeping car, the refusal was the act of the railroad company's

servant, and not of the defendant's, whose duty it was to be guided by the train conductor.

The ejection of the plaintiff was also the act of the railroad company, and not of the defendant. It is the contention of the plaintiff, that, even if he might be ejected from the car, it was done in an improper manner. The plaintiff testified that he was waiting for a "show of force," after his repeated refusals to leave the car. This exhibition of force was made by the train conductor, who put his hand upon him, when the plaintiff rose and yielded thereto. The defendant's conductor took hold of the plaintiff's arm when he rose, and aided the plaintiff in crossing the platform of the cars, but the evidence does not show that he used or exercised any force whatever. Even if he had used force upon the plaintiff, he was not doing the business of the defendant company; he was assisting the train conductor in the duty he was performing as servant of the railroad company. To conduct him across from one car to another in the manner described by the plaintiff himself, after he had repeatedly refused to leave the car, affords no evidence of any removal in an improper manner. The act of the defendant's servant was in every way calculated to assist the plaintiff in his transit from one car to another.

Nor is the fact important that the car into which the plaintiff was passed subsequently became cold, even if it were possible to hold the defendant responsible for the act of its servant. So far as appears by the evidence, there is no reason to believe that, when the plaintiff entered the car, it was not in fit condition to receive passengers; and, by the contract, the management of it and the duty of furnishing fuel were entirely with the railroad company, and not with the defendant.

*Judgment on the verdict.*